IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



SEP - 7 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

MELVIN SEARCY,                     )
                                   )
                Plaintiff,         )
V.                                 )        Civil No. 1:09cv1142
                                   )
GARY LOCKE, et al.,                )
                                   )
                Defendants.        )
                                   )

## MEMORANDUM OPINION

This case is before the Court on the Defendants' Motion To Dismiss And For Summary Judgment.

At all times relevant to Plaintiff Melvin Searcy's ("Searcy") claims, he was employed as a Contract Specialist, GS-1102-12 step 5, Office of Procurement, in the Policy Analysis and Oversight Division at the United States Patent & Trademark Office (hereinafter, "USPTO" or "Agency") in Alexandria, Virginia. Searcy, an African American male, was appointed to position of Contract Specialist on February 5, 2007, and remained until January 28, 2009, the date of resignation.

Searcy's primary functions as a Contract Specialist were, among other things, the management and coordination of a variety of government purchase cards; and Smartpay2 functions compliance and budgeting.

In May of 2008, Eileen McGlinn, a Caucasian female, became Chief of the Policy, Analysis, and Oversight Division, and Searcy's first-line supervisor until the date of his resignation. Searcy's second supervisor was Katherine Kudrewicz, Acting Director, Office of Procurement, USPTO. Kudrewicz is also Caucasian and female.

On June 17, 2008, McGlinn called Searcy on the phone and asked him to come to her office to talk. Searcy replied, "No." She requested again that he come to her office. He again refused. She then advised him that he was leaving no option but to write a "Memo to File". Searcy responded to the effect of "so be it." Searcy then came over to McGlinn's office and stood outside her door. She again asked him to come inside and sit down, but Searcy refused. Searcy told her that for the time being he would be reporting to Kate Kudrewicz instead of McGlinn. McGlinn responded that Searcy would not be reporting to anyone else but her unless that was determined by Kudrewicz, and she asked Searcy twice more to come in and sit down so that they could talk. McGlinn warned Searcy that he could be disciplined for refusing a direct order. He responded that he wasn't being insubordinate, and that McGlinn asks too many questions and that it isn't that he doesn't like her, but that her style gets him upset and he doesn't mesh will with her.

On or about July 8, 2008, Searcy requested of McGlinn permission to take advanced annual leave from July 17, 2008 through

-2-

July 25, 2008 (or forty-eight (48) hours of advanced annual leave), in order to take care of what he described as important financial matters. On July 10, 2008, McGlinn transmitted an email communication to Searcy denying his request for advanced leave. McGlinn advised Searcy, however, that he should revise his request to take leave without pay.

Searcy explicitly concedes at the time of his request, he did not have an entitlement to advanced annual leave, and that he did not have the leave available. He also admits that McGlinn's denial of annual leave was not in retaliation for any prior EEO activity on his part. Rather, Searcy asserts that McGlinn's decision to deny his request was Eileen McGlinn's notional defamatory assumption.

On or about August 1, 2008, Searcy and McGlinn had a verbal exchange after Searcy went to McGlinn's office, and stated that he wanted to see her regarding an email she sent. After McGlinn asked him to sit down, Searcy responded that he was not a dog, and that he was not on a leash. McGlinn asked Searcy to leave her office.

On August 6, 2008, in response to a voicemail message she received earlier that day from Searcy stating that he would be out of the office on August 11, 2008, McGlinn sent Searcy an email. McGlinn's email noted that Searcy had previously called in sick on August 4, 2008, and that he was also out of the office on August 5,

2008, due to car trouble. She advised Searcy that he did not have adequate annual leave and that he was expected to report to work on August 7 and 8, 2008.

Searcy did not report to work on August 7, 2008 nor did he report to work on August 8, 2008. He had not secured approval for these absences.

On August 11, 2008, Searcy contacted the Office of Civil Rights ("OCR") to seek counseling on EEO matters. He alleged discrimination and that he was subjected to a hostile work environment on the basis of his race (African American) and sex (male).

On August 12, 2008, an email meeting request was transmitted to Searcy requesting that he report to an investigatory interview with William House, Employee Relations Specialist, on August 13, 2008 regarding failure to follow supervisory instructions, inappropriate comments to supervisor and inappropriate tone of voice. Searcy responded that he wanted to have a representative present. House advised him, among other things, that he could have a union representative present at the meeting.

On the evening of August 12, 2008, Searcy transmitted an email to McGlinn regarding failure to follow supervisory instructions, inappropriate comments to supervisor and inappropriate tone of voice. Searcy specifically stated that McGlinn had caused a

-4-

hostile work environment and an undue level of stress, and he had contacted law firms about this matter.

On August 13, 2008, Searcy participated in the investigatory interview with House and McGlinn. Prior to the interview, Searcy was provided with a list of the allegations of his misconduct. Two union representatives attended the investigatory interview pursuant to Searcy's request.

Searcy admits that after the investigatory interview he began not reporting to work.

On August 18, 2008, McGlinn instructed Searcy via email, to update two email distribution lists that she had forwarded to him the week prior. She requested that the task be completed by noon on August 19, 2008. Searcy failed to update the list by noon on August 19, 2008.

On August 19, 2008, Searcy was instructed by McGlinn to put together a proposed recommendation of card holder and Approving Official realignment in the Office of General Counsel. He was instructed to complete the task by noon on August 21, 2008. Once again, Searcy failed to complete the assignment by noon on August 21, 2008. As of September 5, 2008, McGlinn had not received the assignment.

On August 19, 2008, Searcy failed to submit a required biweekly report detailing what he accomplished in the previous two

weeks. The report was to be submitted by close of business, every other Tuesday of the week. Although Searcy was previously informed of the deadline by email, he nonetheless, failed to submit a timely report.

Searcy reported to work for only a total of 5 hours on August 28, 2008. On August 29, 2008, he did not report to work at all.

On September 4, 2008, McGlinn transmitted an email to Searcy inquiring as to what time he had reported to work that day, because she had received no communication from him. Searcy did not reply to her email. McGlinn then walked down to Searcy's office at 5:20 p.m., and asked him what time he had reported to work that day. Searcy provided a delayed response, and never turned to face McGlinn while she stood in his doorway. Shortly thereafter, Searcy walked into McGlinn's office and gave her his Purchase Card and Travel Card. He expressed to her that he was returning both cards to her because he did not travel and having the Purchase Card was a conflict of interest and that McGlinn could not make him do it. McGlinn memorialized the September 4, 2008 incident in an email to herself, Kudrewicz, William House, and others on September 5, 2008.

According to McGlinn, several months prior to this incident, Searcy had advised her that he believed it was a conflict for him to be both a Card Holder and the A/OPC, and that he didn't want to be a card holder for the Office of Procurement any longer. McGlinn

had responded that Searcy was required to continue to perform the card holder function until such time as she re-assigned the function. Searcy did not comply with this request.

On or about September 5, 2008, McGlinn relieved Searcy from A/OPC for the Purchase Card Program because his performance of the function was not up to expectations, and because he had previously raised the issue of a possible conflict of interest in fulfilling those duties along with other duties.

On September 5, 2008, McGlinn issued to Searcy a "Notice of Proposed 14-Day Suspension," pursuant to 5. U.S.C. § 7503. The Notice provided ten (10) specifications of acts of improper conduct on the part of Searcy, and explained that Searcy had the right to reply no later than ten (10) working days from the date of receipt of the Notice, orally, in writing, or both and furnish affidavits and other documentary evidence in support of his answer. The specific acts of improper conduct detailed in the Notice include: four (4) distinct specifications of being Absent Without Leave (AWOL) for a total of 27 hours between August 7, 2008 and August 29, 2008; and (6) specifications of failing to obey the lawful orders of his supervisor between June 17, 2008 and September 17, 2008. The specific acts of failing to obey lawful orders were: failing to submit to his supervisor a proposed recommendation regarding card holder and Approving Official realignment; failing

-7-

to submit a routine bi-weekly summary of work accomplishments on two occasions; failing to provide an updated list of Approving Officials to his supervisor; refusing to sit down in his supervisor's office; and failing to inform his supervisor of the time that the reported to work on a certain date.

Searcy received the "Notice of Proposed 14-Day Suspension" on September 9, 2008. He did not respond to the Notice.

On September 10, 2008, McGlinn issued to Searcy, a notice of "Removal From Increased Flextime Policy," which informed Searcy, among other things, that he was barred from participating in the Increased Flextime Policy effective September 29, 2008, and that his new working hours would be from Monday through Friday, 8:30 a.m. to 5:00 p.m., including 30-minute lunch period.

The notice further advised Searcy that the annual leave "shall be planned and requested in advance." It also emphasized that leaving a message with a coworker or on McGlinn's voice mail did not constitute an approved leave request. Finally, Searcy was informed that his removal from participation in the flexible work scheduled program was not a disciplinary action and would not be filed in his Official Personnel Folder (OPF), however, failure to adhere to his new schedule may result in disciplinary or adverse action being taken against him.

USPTO Guidance on Work Schedules, Core Hours, Credit Hours, Advanced Leave, Absent Without Leave, Compensatory Time, and Comp Time for Travel for Employees on the General Schedule, provides that supervisors may restrict work schedules for employees with performance or conduct issues. Moreover, USPTO's Time and Attendance Policy provides that employees will request permission for leave in advance, except in cases of emergency.

On September 30, 2008, Kudrewicz issued to Searcy a Decision on Proposed Suspension, informing Searcy that she would sustain the charge and specifications detailed in the September 9, 2008 Notice of Proposed 14-Day Suspension. Specifically, Kudrewicz explained that she had considered the evidence of record, and determined that it supported her finding that Searcy had engaged in improper conduct by incurring 32 hours of AWOL; not following McGlinn's instructions; and engaging in disrespectful conduct towards McGlinn. According to McGlinn, Searcy's repeated failure to follow supervisory instructions, and report to work when scheduled demonstrated a lack of respect for Agency authority, and in her view required correction by administrative action. In light of this, and given the seriousness of Searcy's misconduct, McGlinn determined to suspend Searcy for fourteen (14) calender days to be served from Sunday October 12, 2008 through Saturday, October

-9-

25, 2008. He was expected to report back to work on Monday, October 27, 2008.

Searcy served his fourteen (14)-day suspension from Saturday, October 12 to Saturday, October 25, 2008. Despite the disciplinary action, Searcy's attendance problems did not improve. He did not report back to work on October 27, 2008, and apparently he did not return until October 31, 2008.

On October 29, 2008, McGlinn issued to Searcy, a Direct-to-Work Notice, stating that Searcy had not reported to work since September 11, 2008, and directing him to report to work no later than the next business day after receiving the memorandum.

He received the Direct-to-Work Notice via Federal Express delivery to his home on October 31, 2008.

Agency secure entrance records show that Searcy entered the USPTO premises on the afternoon of October 31, 2008.

Agency secure entrance records show that Searcy also entered the USPTO premises intermittently on November 3, 5, 6, and 7, 2008.

On November 5, 2008, Searcy received an unacceptable rating for his performance in Fiscal Year (FY) 2008. A rating of unacceptable is the lowest rating of five possible ratings. In descending order from highest to lowest, the possible ratings are: outstanding; commendable; fully successful; marginal; and unacceptable. These categories correspond with number ratings. A

-10-

rating of outstanding corresponds with a number rating 5; commendable corresponds with a number rating of 4, in descending order, with unacceptable corresponding with a number rating of 1.

McGlinn rated Searcy's performance in three critical job elements: Strategic Development; Individual Effectiveness; and Office Effectiveness and Efficiency. While Searcy was assigned a rating of fully successful in Strategic Development, he was rated as marginal with a corresponding number rating of 2 under the Individual Effectiveness element, and he was rated as unacceptable with a corresponding number rating of 1 for Office Effectiveness and Efficiency.

Based on the sum score of all three critical elements, Searcy was assigned an overall rating of Unacceptable. Searcy's rating was approved and signed by Kudrewicz on October 21, 2008. Searcy refused to sign the performance evaluation.

A January 5, 2009, inquiry of Agency secure entrance records showed that Searcy did not enter the USPTO premises at all, and thus did not report to work from November 8, 2008 through January 5, 2009. Searcy had not secured approval for his absence for this period.

On January 13, 2009, McGlinn issued to Searcy a Notice of Proposed Removal, which charged him with 42 specifications of Improper Conduct for being AWOL for approximately 323 hours from

-11-

October 27, 2008 through January 2, 2009. The Notice explained, among other things, that Searcy had been AWOL for the above referenced dates, without previously securing approval for his absence. Searcy was informed that the amount and manner of his unapproved absences is unacceptable and considered to be a very serious matter. Specifically, Searcy was advised that his absences impose an unnecessary burden on the operations of the Office of Procurement and have a detrimental impact on USPTO's ability to accomplish its mission.

The Notice of Proposed Removal also properly informed Searcy of his rights, including fee right to reply within 10 working days. Searcy did not reply to the Notice of Proposed Removal.

On January 28, 2009, Searcy transmitted an email communication with subject line: "Constructive Discharge Resignation under Duress (EEOC 08-56-96)" to various individuals at USPTO, including McGlinn and Kudrewicz. Searcy's email stated, among other things, the following: "I Melvin Searcy, Jr. [,] formally submit this letter as a Constructive Discharge Resignation under Duress from the Department of Commerce, U.S. Patent & Trademark Office, Office of Procurement. "

The Agency effected Searcy's resignation on January 28, 2009, and, in accordance with Office of Personnel Management guidance, the Agency noted the resignation was submitted after receipt of

written notice of a proposal to separate Searcy for improper conduct.

A complaint survives a motion to dismiss where it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct 1955,167 L.Ed.2d 929 (2007)). A court properly dismisses a complaint on a Rule 12(b)(6) motion based upon the "lack of a cognizable legal theory or the absence of sufficient facts alleged under the cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696,699 (9th Cir. 1990). When considering a 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443,447 (9th Cir. 2000). Although a pleading need not include "detailed factual allegations," it must be "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S.Ct at 1949. Conclusory allegations or allegations that are no more than legal conclusions "are not entitled to the assumption of truth." Id. at 1950. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient Id. at 1949 (citations

-13-

and internal quotation marks omitted).

Summary judgment should be rendered where the administrative record reveals "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c); see also Chandler v. Roudebush, 425 U.S. 840, 863 n.39 (1976) (noting that in federal-sector employment discrimination cases, the administrative record may be relied upon in pretrial proceedings).

Because Plaintiff will bear the burden of proof at trial, defendant may fulfill his obligation on a summary judgment motion by showing that there is a lack of evidence to carry plaintiffs burden as to any essential element of the cause of action. See Celotex Corp. v. Catrett, 477 U.S. 317, 333 (1986); Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390,393-94 (4th Cir. 1994).

Plaintiffs burden, then, to withstand summary judgment, is to go beyond mere allegations and controvert defendant by set[ting] out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added); Celotex, 477 U.S. at 324. "[T]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Abney v. Coe, 493 F.3d 412, 420 (4th Cir. 2007). For example, plaintiff cannot create a genuine issue of

material fact through mere speculation; or through the building of one inference upon another; or by pointing to a scintilla of evidence in support of his claims. <u>Othentec Lts. v. Phelan</u>, 526 F.3d 135,140 (4th Cir. 2008); <u>see</u> <u>Anderson</u>, 477 U.S. at 252. Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1776 (2007) (emphasis added); <u>Abney</u>, 493 F.3d at 420.

To establish a *prima facie* case of retaliation, Searcy must demonstrate that he engaged in protected activity; an adverse employment action was taken against him; and there was a causal link between the protected activity and the adverse action. <u>Laber v. Harvey</u>, 438 F.3d 404, 432 (4th Cir. 2006) (en banc). Each of Searcy's retaliation claims fail for at least two independent reasons. First, certain of the allegedly retaliatory conduct at issue do not rise to the level of material adversity within the meaning of <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 126 S. Ct. 2405 (2006). The Supreme Court held in <u>Burlington Northern</u> that a private sector employee who alleges retaliation under 42 U.S.C. §2000e-3(a) need not show that he experienced an adverse personnel action to state a claim for retaliation under Title VII.

-15-

Second, for at least two of his claims, there is no causal connection between his protected activity and the allegedly retaliatory conduct. In any event, legitimate, nonretaliatory reasons that Searcy cannot rebut as pretext foreclose all of his retaliation claims.

Two of Searcy's retaliation claims are that USPTO retaliated against him when: (1) On August 6, 2008 after he informed his first-line supervisor McGlinn via a voicemail message that he would be absent from work until August 11,2008, McGlinn responded in writing that Searcy's voicemail had not provided an adequate reason for his absence; and (2) On September 5,2008, he was removed from HCO designated responsibilities as the Agency Organization Purchase Card Program Coordinator. Neither of the claims state a cognizable claim of unlawful retaliation.

One of Searcy's claims of retaliation is that on August 6,2008, in response to a voicemail message which he left for McGlinn stating that he would be absent from work from August 6, 2008 until August 11,2008, she transmitted an email to him that he had not provided an adequate reason for his absence. McGlinn's email also informed Searcy that he had insufficient annual leave time, and therefore, that he was expected to report to work the following day, August 7,2008. McGlinn also informed Searcy that unless he reported to work, his time would reflect AWOL status for

the days he remained absent.

Absent some concrete harm, merely responding to Searcy's message to inform him of his leave status, and to inform him that he had not provided sufficient reason for his leave, is far from a materially adverse action on the part of McGlinn. Its undisputed that as stated in McGlinn's email, Searcy had an insufficient leave balance on the date of the email. It is also undisputed that Searcy took this leave in contravention of the Agency's time and attendance policy. He had not made a request in advance of taking time off, nor did he indicate he would be out due to an emergency. Finally, it goes without saying that simply responding to Searcy taking take time off for which he had insufficient leave, is well within the purview of McGlinn's duties as Searcy's direct supervisor. Informing Searcy of his inadequate leave balance is not type of materially adverse conduct that would dissuade a reasonable employee from bringing a charge of discrimination. Moreover, Searcy fails to establish a *prima facie* case of retaliation because he has not alleged that McGlinn's response constituted or resulted in any job related detriment.

At most, McGlinn's response is no more than a "petty slight, [or] minor annoyance..." of the kind which the <u>Burlington Northern</u> Court expressly distinguished from true materially adverse actions. <u>Burlington Northern</u>, 548 U.S. at 68.

Searcy also alleges that in retaliation for protected activity, he was removed from HCO designated responsibilities as the A/OPC for Purchase Card Program. This allegation also fails to state a cognizable claim for retaliation because this is not a materially adverse action within the meaning of Burlington Northern.

Initially, Searcy was relieved of HCO responsibilities not only because he was not adequately performing those functions, but only after he explicitly asked McGlinn on more than one occasion to take those responsibilities away from him. Thus, in reality, he is now claiming retaliation for action taken on the part of USPTO, partly as a result of his own explicit requests.

Moreover, although Searcy speculates that relief from his HCO responsibilities constitutes retaliation on the part USPTO, he has not alleged, much less offered any competent evidence that he suffered materially adverse consequences as a result. Searcy's HCO responsibilities were taken away as a direct result of his request, and because he was not performing the function adequately. Moreover, Searcy has not allege that relief of the assignment resulted in any job-related detriment. He can point to no decrease in pay, benefits or working conditions as a result. See Higgins v. Gonzales, 481 F.3d 578, 585 (8th Cir. 2007).

Next, Searcy alleges that his removal from Increased Flextime Policy on September 10, 2008 was also retaliatory. This too, does not constitute a materially adverse employment action. Agency regulation provides that McGlinn had the discretion to restrict Searcy's work schedule given his performance and conduct issues. As provided by Agency guidance, the Increased Flextime option can be restricted and is provided at the discretion of supervisors and/or managers.

Searcy further alleges that Kudrewicz and McGlinn's failure to report his hostile work environment and harassment claims constitutes retaliation. However, the evidence demonstrates that Searcy did not inform Kudrewicz and McGlinn of his allegations of hostile work environment and harassment until his August 12, 2008 email. This was one day after Searcy had already contacted the Office of Civil Rights with the same claims.

Searcy fails to establish the third element of a *prima facie* case for at least two of his retaliation claims: that (1) on or about July 8, 2008 he was denied advance leave; and (2) on August 6, 2008 he was informed by McGinn that he has not provided adequate reasons for his absence. Neither of these purported retaliatory actions on the part of USPTO occurred before Searcy engaged in any protected activity, and therefore fail the causal nexus element of a *prima facie* retaliation case.

To establish the third element of a *prima facie* retaliation claim, Searcy must demonstrate that a causal connection exists between the protected activity and the purported adverse action. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005). Although he alleges that he engaged in protected activity in June 2008, as discussed above, Searcy does so in error. The evidence demonstrates that Searcy made initial contact with OCR to lodge discrimination claims on August 11, 2008, and his email transmittal to McGlinn and Kudrewicz alleging hostile work environment was on August 12, 2008. Both occurred after both his July 8, 2008, and August 6, 2008 claims. And, Searcy can point to evidence that McGlinn or Kudrewicz were aware of any protected activity on his part prior to August 12, 2008. There simply is no evidence in the record that he engaged in protected activity anytime in June 2008. Therefore, Searcy fails to establish a *prima facie* case with respect to these particular claims because there is no causal nexus between the conduct and his protected activity.

Searcy's remaining claims of retaliation are that: (1) on or about July 8, 2008 he was denied a request to take advanced leave; (2) on August 13, 2008 Employee Relations Specialist William House

conducted an investigatory interview with Searcy; (3) on September 9, 2008 he was issued a Notice of Proposed Suspension; and (4) on October 10, 2008, he was issued an inaccurate and improper negative FY 2008 performance evaluation. Like all of his other claims, these claims fail because the agency has articulated legitimate, nondiscriminatory, and nonretaliatory reasons for its actions, which Searcy cannot rebut as pretext with competent evidence.

Searey alleges that McGlinn retaliated against him when on or about July 8, 2008 he was denied a request for advanced leave. But it is irrefutable that the basis of the denial was solely his inadequate annual leave balance, which would not cover the forty-eight (48) hours of advanced annual leave his proposed absence would require. In view of that fact, McGlinn instructed Searcy to revise his request to take leave without pay instead of advanced annual leave. And, fatal to this claim is Searcy's own admission that McGlinn's denial of his advance leave in this instance, was not done in retaliation for any prior EEO activity on his part. Rather, Searcy asserts that the decision was simply Eileen McGlinn's notional defamatory assumption.

Searcy also alleges that USPTO retaliated against him when he was required to attend an investigatory interview on August 13, 2008 at the request of Employee Relations Specialist William House. In particular, Searcy asserts that he was not given adequate time

-21-

to prepare for the interview and during the interview he was informed that he would be suspended for 15 days, or more. Initially, as the evidence in the administrative record demonstrates, Searcy's claim misstates the facts. He was informed a day in advance of the meeting; the subject of the meeting, and was afforded the opportunity to submit questions to Bill House and his union representative for which he received prompt responses. Moreover, at his request, two union representatives attended the meeting as witnesses.

The evidence also establishes that investigatory interview was called in response to Searcy's history of misconduct which immediately preceded the interview. USPTO was explicit in stating that the interview was warranted to address the claims of Searcy's failure to follow supervisory instructions; inappropriate comments to his supervisor, and inappropriate tone of voice. This is unquestionably a legitimate, nondiscriminatory, and nonretaliatory reason for the interview, which Searcy cannot rebut as pretext.

Searcy further claims that the September 5, 2008, Notice of Proposed Suspension, which he received on September 9, 2008, was in retaliatory on the part of USPTO.

It is irrefutable that USPTO issued Searcy's September 5, 2008 Notice of Proposed Suspension, not for any unlawful reason but because of his singular history of absences, all AWOL, and his

pattern of misconduct. The evidence establishes that immediately prior to issuance of the Notice of Proposed Suspension, Searcy had a documented history of multiple absences without approved leave beginning in early August, 2008. The evidence also establishes that during this same period, Searcy displayed multiple instances of improper conduct, including the failure to complete assignments in a timely manner, to complete them entirely, and failure to comply with the direct orders of his supervisor. Prior to the September 5, 2008, Notice of Proposed 14-Day Suspension, Searcy was advised that he had insufficient leave available for absences from work. Still, Searcy continued to take leave without prior approval. He was also given sufficient time to complete assignments which he either completed in an untimely manner, or did not complete at all. Importantly, he was warned that failure to follow direct orders from his supervisor could result in disciplinary action.

Consequently, USPTO's Notice of Proposed Suspension was clear in stating that it was issued because the Agency considered Searcy's acts of misconduct to be a serious matter that imposed an undue hardship on his supervisor, and prevents the office from operating as efficiently as it should. Citing the multiple instances of attendance, performance and behavioral infractions, USPTO also took into account various other factors including, among others, Searcy's job level; the effect of the offenses on Searcy's

-23-

ability to perform at a satisfactory level; his notice of any rules that were violated in committing the infractions; and the adequacy and effectiveness of alternative sanctions to deter future misconduct. These are no doubt, legitimate, nondiscriminatory, and nonretaliatory reasons for the Notice of the Proposed 14-day Suspension.

Searcy claims retaliation based upon his dissatisfaction with having been issued a performance rating of unacceptable for FY 2008. Searcy alleges that he was issued an inaccurate and improper negative evaluation that was not in compliance with OPM regulations. As discussed above, Searcy's rating officials provided ample documentation of his failure to perform. In addition to their statements, the summary judgment record is replete with documentation of his performance deficiencies, throughout FY 2008, which began as early as August 2008, and which Searcy cannot refute. Moreover, Searcy had been advised on multiple occasions through a series of emails from his supervisor, discussions, and a proposed suspension and ultimate suspension, that his performance deficiencies were a serious concern and required his immediate attention. In view of these continued deficiencies, Searcy's rating was more than justified.

Finally, with respect to the other of Searcy's claims of retaliation discussed at length above, the evidence demonstrates

that the USPTO's legitimate, nondiscriminatory, and nonretaliatory reasons also defeat those retaliation claims. See Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253,258 (4th Cir. 1998) (explaining that claims of retaliation, like claims of discrimination, are subject to McDonnell-Douglas burden-shifting regime). The legitimate, nonretaliatory, nondiscriminatory reasons for those actions have been explained at great length above, and need not be repeated here. Searcy has offered no evidence in the record sufficient to rebut these reasons, nor has he presented any evidence that USPTO harbored any retaliatory animus towards him. See Autry v. North Carolina Dep't of Human Res., 820 F.2d 1384,1386 (4th Cir. 1987) ("Mere speculation by the plaintiff that the defendant had a discriminatory motive is not enough to withstand a motion for summary judgment.").

Searcy's Amended Complaint also cites, without allegations of any supporting facts, the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d). The EPA prohibits certain employers from discriminating in pay on account of sex. The essence of an EPA claim is that a plaintiff performed a job that required substantially equal skill and effort, but was paid less than similarly situated employees of the opposite sex. See Corning Glassworks v. Brennan, 417 U.S. 188, 195 (1974); Balmer v. HCA, Inc., 423 F.3d 606,611-12 (6th Cir. 2005); see also Ambrose v. Summit Polymers, Inc., 172 F. App"x 103,

105 (6th Cir. 2006). To establish a *prima facie* case of disparate pay under the EPA, a plaintiff must prove: (1) that his employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions." Gustin v. W. Va. Univ., 63 Fed. Appx. 695, 698 (4th Cir. 2003). Searcy's Amended Complaint, and accompanying attachments are devoid of any allegation, or even a hint that gender-based pay differential at his place of employment, or that women performing the same work were given a higher wage than. Therefore, Searcy's reference to the Equal Pay Act, 29 U.S.C. § 206(d), without more, is facially deficient to assert a claim under the Equal Pay Act and any such claim should be dismissed under Fed. R. Civ. P. 12(b)(6).

Searcy also alleges in a conclusory manner, a claim of Fraud and Obstruction. He further alleges, without supporting facts, that USPTO continues to retaliate against him. In support of these bald allegations he cites a laundry list of criminal statutes which includes, among other statutes 18 U.S.C §§ 1512(A), 1513(E), 1516, 1621 and 241. But none of these statutes afford him a private right of action. As just one example, Section 1621 penalizes perjury and false declarations under oath. See 18 U.S.C. § 1621. And, Section 241 imposes criminal penalties of fines and imprisonment for

conspiring to injure, oppress, threaten, or intimidate any person in the free exercise or enjoyment of any right or privilege. See 18 U.S.C. § 241. Like the rest of the statutes cited by Searcy, neither of these criminal statutes afford Plaintiff a private right of action, and those claims should therefore be dismissed for failure to state a claim, along with all the other criminal statutes he cites. See Cok v. Cosentino, 876 F.2d 1, 3-4 (1st Cir. 1989); LaBoy v. Zuley, 747 F.Supp. 1284, 1289 (N.D. Ill. 1990) (stating that Section 1621 does not state a private cause of action). See, e.g., Aldabe v. Aldabe, 616 F.2d 1089,1092 (9th Cir. 1980); Ippolito v. Meisel, 958 F.Supp. 155, 167 (S.D.N.Y. 1997).

It is well-established that harassment in retaliation for an individual's engaging in protected activity violates federal antidiscrimination law. See, e.g., Von Gunten v. Maryland, 243 F.3d 858, 869-70 (4th Cir. 2001) (overruled on other grounds by Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 67-68 (2006). It is axiomatic, however, that federal antidiscrimination laws are not intended to be "'a general civility code for the American workplace.'" Burlington Northern, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Instead Title VII provides a remedy when an employee's workplace has become permeated with discriminatory intimidation, ridicule, and insult, so as to alter the conditions of Plaintiff's employment

and create an abusive working environment. <u>Harris v. Forklift Sys.,</u> <u>Inc.</u>, 510 U.S. 17,21 (1993). Only severe or pervasive conduct that creates an environment that a reasonable person would find hostile is actionable. Thus, a plaintiff cannot overcome summary judgment by demonstrating mere unpleasantness in his workplace. <u>Hartsell v.</u> <u>Duplex Prods., Inc.</u>, 123 F.3d 766, 772 (4th Cir. 1997). The standard for proving hostile work environment is intended to be a high one. <u>Chika v. Planning Research Corp.</u>, 179 Supp. 2d 575, 588 (D.Md. 2002). Searcy falls far short of meeting this standard.

The allegedly retaliatory actions of which Searcy complains are not such that a reasonable person would believe that Searcy's workplace was permeated with discriminatory intimidation ridicule, and insult so as to alter the conditions of his employment and create an abusive working environment. These purported retaliatory actions are not only plainly not severe or physically threatening or humiliating; they occurred as a direct result of Searcy's misconduct and performance deficiencies, over a period of almost seven months, and there is no evidence that they unreasonably interfered with Searcy's work performance.

For the reasons set forth above, Defendants' Motions should be granted and this case dismissed.

An appropriate Order shall issue.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia
September 7 , 2010